AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

> FILED
> CLERK, U.S. DISTRICT COURT
>
> 9/14/2022
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _Feliciana Sunser_ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| ARTHUR RAFFY ASLANIAN and SESAR RIVERA, | Case No.   2:22-mj-03678-DUTY |
| Defendants. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2022 to August 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Conspiracy to Murder for Hire |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Blake MacLearnsberry
_____
Complainant's signature

Blake MacLearnsberry, ATF Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        9/14/22

_____
Judge's signature

City and state:   Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
_____
Printed name and title

### AFFIDAVIT

I, Blake MacLearnsberry, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.    I am an ATF Special Agent ("SA") and have been so employed since 2019.  Prior to being employed as an ATF SA, I was an accountant for approximately six years working in both public accounting and corporate accounting.  I have performed reviews, compilations, tax preparation, internal audits, and many other accounting tasks and am well versed in audit practice and procedure, Internal Revenue Codes, and other taxation law.

2.    I graduated from Seattle University with a Bachelor of Arts degrees in Accounting and Marketing.  I also graduated from the ATF's Special Agent Basic Training and from the Department of Homeland Security's Criminal Investigator Training Program. I received training and have experience in the trafficking of firearms and controlled substances, including but not limited to the identification of controlled substances and the use of coded language.  I also received training in the fields of arson and explosives.  I have participated in dozens of investigations involving the illegal sales, transfer, and possession of firearms and controlled substances and I have interviewed defendants, informants, murder suspects, and witnesses with first-hand knowledge of methods for trafficking the same. Additionally, I have participated in many investigations into the activities of gangs and their use of firearms, including conducting surveillance and using confidential informants and

undercover agents ("UCs") to make controlled purchases of illegal drugs and/or firearms and gather information about criminal enterprises.

3.    I have also been trained in investigating murder-for-hire cases and have consulted other agents with greater experience in murder-for-hire investigations, including the methods used by individuals seeking to hire someone to murder a victim and certain behavior patterns common to murder-for-hire suspects.

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of a criminal complaints against, and arrest warrants for, Sesar RIVERA ("RIVERA") and Arthur ASLANIAN ("ASLANIAN"), for a violation 18 U.S.C. § 1958 (Conspiracy to Use Interstate Commerce Facilities in the Commission of Murder-for-Hire).

5.    This affidavit is also made in support of search warrants for the following:

a.    The premises located at 5300 Alta Canyada Road, La Canada Flintridge, California 91011, believed to be ASLANIAN's residence, as described more fully in Attachment A-1 ("SUBJECT PREMISES 1");

b.    The premises located at 5761 Fair Avenue, Apartment 3, North Hollywood, California, 91601, believed to be RIVERA's residence, as described more fully in Attachment A-2 ("SUBJECT PREMISES 2");

c.    The person of ASLANIAN, as described more fully in Attachment A-3; and

d.    The person of RIVERA, as described more fully in
Attachment A-4.

6.    The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. § 1958 (Conspiracy to Commit Murder-For-Hire, Murder for
Hire) (the "SUBJECT OFFENSES"), as described more fully in
Attachment B.  Attachments A-1, A-2, A-3, A-4, and B are
incorporated herein by reference.

7.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Beginning in late July 2022, law enforcement became
aware of a murder-for-hire plot in which ASLANIAN and RIVERA
reached out to a third party to have two targets murdered.  The
intended murder targets, M.Y. and S.E., were each involved in
separate litigation against ASLANIAN.  Law enforcement was able
to record phone calls and messages between RIVERA and a
cooperating witness (the "CW"), who was the third party that
ASLANIAN and RIVERA HAD hired to kill M.Y. and S.E.  Law

enforcement was also able to record meetings among the CW, an
undercover agent posing as an assassin (the "UC"), and RIVERA
discussing the murder-for-hire plot and the intended victims.
Following one such meeting in August 2022 among the CW, the UC,
and RIVERA regarding the murder-for-hire scheme, RIVERA said he
would be going to meet with ASLANIAN.  Later that day, law
enforcement surveilled (and photographed) a meeting between
RIVERA and ASLANIAN in a parking lot in North Hollywood.  After
that meeting, RIVERA told the CW that RIVERA and ASLANIAN had
discussed the murder-for-hire and had decided that they wanted
to launder the money for the murder so that it could not be
traced to ASLANIAN.

    9.    Following this meeting law enforcement detained and
questioned RIVERA, who corroborated the information provided by
the CW.  At the direction of law enforcement, RIVERA met with
ASLANIAN to confirm that ASLANIAN wanted to move forward with
the murder.  ASLANIAN confirmed that he wanted S.E. murdered and
advised RIVERA on how to avoid getting caught by law enforcement
when the murder was to be committed.  Finally, law enforcement
was able to identify through public records the lawsuits in
which ASLANIAN and the intended victims were involved, which
corroborated RIVERA's statements to the CW about the reasons why
ASLANIAN wanted the targets murdered.  A search of law
enforcement databases and follow-up surveillance showed that
ASLANIAN resides at SUBJECT PREMISES 1 and RIVERA resides at
SUBJECT PREMISES 2.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    RIVERA Approaches the CW about Murdering M.Y. and S.E. for ASLANIAN

10.   In late July 2022, the CW[1] told police officers that a friend named "Sesar" had recently approached the CW about murdering someone on behalf of "Sesar's" boss, "Arthur."  The CW said that "Sesar" lived at SUBJECT PREMISES 2.  The CW later identified "Sesar" as RIVERA.

11.   The CW stated that, in April 2022, RIVERA contacted the CW by phone and asked to meet outside his apartment, SUBJECT PREMISES 2.  During this meeting, RIVERA said that a real estate businessman, "Arthur," wanted to pay the CW to kill two people who were involved in litigation against "Arthur."  RIVERA said that one of the targets lived in the Beverly Hills area and the other lived near Santa Clarita.  RIVERA asked the CW if the CW would kill the targets in exchange for money.  RIVERA said that "Arthur" had written the name and place of business of one of the targets down on a piece of paper and provided it to RIVERA. The CW told RIVERA that he was interested in carrying out the murders, but had privately decided to collect money from RIVERA and "Arthur" up front and then refrain from murdering the intended targets.

12.   In July 2022, RIVERA again contacted the CW via text message and asked to meet in person again.  During this meeting,

---

[1] The CW is working with law enforcement in hopes of receiving favorable consideration in connection with an ongoing criminal case.  The CW is a self-professed gang member and has previous convictions for assault, felon in possession of a firearm, possession of a weapon in prison, burglary, robbery, evasion, and assault with a deadly weapon.

RIVERA asked the CW about carrying out the murders and said that "Arthur" wanted the killings done as quickly as possible. RIVERA asked the CW how he would carry out the killings, and the CW responded that he would probably shoot the victims.

13.  The CW surreptitiously recorded a portion of this July 2022 in-person meeting on his phone and provided a copy of the recording to investigators.  The CW further identified the CW's voice and RIVERA's voice on the recording.

14.  In the recording, RIVERA told the CW that he did not want to accompany the CW during the murders.  The CW responded that the CW preferred to do the job himself anyways.  The CW then told RIVERA that the CW needed to get his car fixed before doing the job.  The CW also said that he needed to get paid before the job rather than get the whole amount after the job was done.

15.  During the meeting, RIVERA also said that "the Beverly Hills one is done, fool.  He lost that case already."  The CW then responded, "then what's the other one, the one in Santa Clarita?"  RIVERA then replied, "Yeah."  The CW understood RIVERA to mean that he wanted the Santa Clarita target killed but did not want the Beverly Hills target to be killed.  The CW expressed concern to RIVERA multiple times as to whether the CW would be paid for killing the targets.  RIVERA continually reassured the CW that the CW would be paid in full as soon as the job was done.

**B.    The CW Identifies M.Y. as an Intended Victim of RIVERA and "Arthur's" Murder-For-Hire Scheme**

16.    On August 2, 2022, the CW again met with agents to discuss his dealings with RIVERA.  The CW again stated that RIVERA lived at SUBJECT PREMISES 2 and identified "Sesar's" cell phone number as (323) 873-9231 ("Rivera Cell").  The CW also said that RIVERA used to be the CW's boss and that RIVERA, in turn, worked for "Arthur" polishing floors and concrete.  The CW also reported that "Arthur" owned an apartment complex in North Hollywood, California, named the "Juliette."

17.    The CW provided additional information about the people that RIVERA and "Arthur" wanted killed.  The CW identified the first victim as M.Y., an attorney with an office based in Santa Clarita.  The CW showed agents a photograph from the CW's phone of M.Y.'s biographical page from his law firm's website.  The CW reported that, during the July 2022 in-person meeting with RIVERA, in the presence of the CW, RIVERA had done an internet search for M.Y.'s name, found the biographical page and picture, shared the picture with the CW, and confirmed that M.Y. was the lawyer that "Arthur" wanted killed.  Additionally, the CW reported that RIVERA had a note that was handwritten by "Arthur" with M.Y's name and place of business written on it. The CW reported that he took a picture of the note and shared the picture that he took with law enforcement.  However, the CW also reported that RIVERA had taken the piece of paper with him after the meeting.

18.   The CW told agents that he had recorded a portion of this July 2022 meeting with RIVERA because he wanted law enforcement to believe his account of RIVERA's and "Arthur's" involvement in the murder scheme.

19.   During their July 2022 meeting, the CW had negotiated a price of $20,000 to kill M.Y.  The CW asked for half the money up front but RIVERA refused stating that "Arthur" would only pay the entire sum when the job was done.  RIVERA also said that "Arthur" wanted photographic proof that the murder had been carried out.

**C.    Law Enforcement Identifies RIVERA and ASLANIAN as the Murder-for-Hire Plotters**

20.   While interviewing the CW, law enforcement ran database queries for SUBJECT PREMISES 2 and saw that RIVERA was associated with that address.  When law enforcement showed the CW a DMV photograph of RIVERA, the CW confirmed that the photograph showed the man that the CW knew as "Sesar."

21.   Following the interview with the CW, law enforcement ran database queries based on information provided by the CW regarding "Arthur."  Public internet searches for "Juliette Apartments" in North Hollywood revealed a website for an entity, LJ Properties, Inc., that owned or managed the "Juliette Apartments of North Hollywood."  A public records search for LJ Properties, Inc., showed that ASLANIAN was listed as an agent for that company.

22.   On August 2, 2022, authorities met with M.Y. and his assistant.  Agents informed M.Y. that he was the target of a

plot to have him murdered and asked if he was involved in any lawsuits concerning LJ Properties, Inc.  M.Y. responded that he had previously been retained by ASLANIAN, the owner of LJ Properties, Inc., in connection with a bankruptcy proceeding. M.Y. said that his firm had prevailed in the bankruptcy case but that ASLANIAN refused to pay approximately $220,000 in legal fees and expenses to M.Y.'s firm.  In early 2022, M.Y.'s firm had filed paperwork to seek to mediate their dispute and had made preparations to file a lawsuit against ASLANIAN if the mediation was not successful.

23.  ATF agents showed M.Y. a DMV photograph of ASLANIAN and M.Y. identified the person in the photograph as the same individual who M.Y. had represented in the bankruptcy proceeding.

24.  A search of records for the United States Bankruptcy Court, Central District of California, revealed a bankruptcy proceeding filed in 2018 in which M.Y. had represented an entity called 4402 Mammoth Investors, LLC.  An online search revealed that a filing by 4402 Mammoth Investors, LLC, to the California Secretary of State listed ASLANIAN as the "Member-Manager" of that entity who signed a document entitled "Limited Liability Company Certificate of Amendment."

25.  A DMV records search for ASLANIAN showed that his address was SUBJECT PREMISES 1.

D.   **RIVERA Meets Again with the CW and Tells the CW to Kill the Target from "Wilshire" First**

26.   On August 10, 2022, RIVERA texted the CW from Rivera Cell and told the CW to come to SUBJECT PREMISES 2 for a meeting.  The CW met with ATF agents and was equipped with an audiovisual recording device that would provide agents with a live audio feed and record video and audio of the interaction. ATF agents were also positioned nearby to conduct surveillance of the meeting between the CW and RIVERA.

27.   At approximately 5:04 p.m., the CW knocked on the front door of SUBJECT PREMISES 2 and RIVERA's girlfriend answered.  She told the CW that RIVERA was around the corner fixing an air conditioner for a neighbor.  At approximately 5:07 p.m., the CW walked to the back of SUBJECT PREMISES 2 and saw RIVERA working on an air conditioner unit with two others. The CW asked to speak with RIVERA in private and RIVERA agreed.

28.   At approximately 5:12 p.m., RIVERA and the CW walked to the apartment complex's parking lot and discussed the planned murders.  The CW told RIVERA that the job would be difficult because the target was an attorney, not just some random person. RIVERA then told the CW that ASLANIAN wanted to focus on the target from "Wilshire" over the "other" attorney from Santa Clarita (referring to M.Y.) for now.

E.   **The CW Meets with RIVERA to Find out the Identity of the "Wilshire" or "Beverly Hills" Target**

29.   On August 19, 2022, at the direction of law enforcement, the CW met with RIVERA at SUBJECT PREMISES 2 to

further discuss the murder-for-hire plot and to identify the "Wilshire" target that ASLANIAN wanted murdered.

30.   While at SUBJECT PREMISES 2, the CW stated to RIVERA that the CW was ready to make money and wanted to get paid.  The CW then asked RIVERA about ASLANIAN.  RIVERA explained to the CW that RIVERA had not yet met with ASLANIAN, but was planning to do so.  RIVERA stated to the CW that ASLANIAN was planning to give RIVERA $2,000 for RIVERA's girlfriend's schooling.  RIVERA stated to the CW that when RIVERA meets with ASLANIAN, RIVERA would talk to ASLANIAN about the CW getting paid.

31.   The CW, referring to the planned murders, then asked RIVERA, "Does he want this shit done or what?"  RIVERA replied, "Yeah."

32.   The CW then asked RIVERA, "Do you have the address for 'Beverly Hills,'[2] so I can check it?"  RIVERA stated to the CW that RIVERA did not have the address for "Beverly Hills," but had the victim's Facebook information.  The CW asked RIVERA, "You have the attorney on your Facebook?"  RIVERA replied, "Yeah, I looked him up."  RIVERA advised the CW that RIVERA needed to get rid of it, referring to the victim's Facebook information.

33.   The CW stated to RIVERA that if ASLANIAN wanted to "get it done" then RIVERA needed to talk to ASLANIAN that night. RIVERA explained to the CW that RIVERA did not have the address

---

[2] The CW is referring to one of ASLANIAN's intended murder victims who had only been referred to by RIVERA as "Beverly Hills" and "Wilshire" during previous meetings between the CW and RIVERA.

for "Beverly Hills", and added, ". . . the address he had is not his, so his mom stays there." RIVERA told the CW that RIVERA forgot the real name of "Beverly Hills," but stated RIVERA had a screenshot of the victim. RIVERA told the CW that RIVERA would send the victim's screenshot to the CW later.

34. The CW then asked RIVERA if ASLANIAN was coming to RIVERA's apartment today. RIVERA stated that RIVERA sent ASLANIAN a text message that day and intended to meet with ASLANIAN either that day or the next day.

35. The CW concluded the conversation by asking RIVERA again if ASLANIAN really wants it, referring to the planned murders. RIVERA again replied, "Yeah, he does."

36. Later that night, RIVERA sent the CW a multi-media message via the Facebook Messenger application. The message sent was a screenshot image of the Facebook profile of S.E. The image contained a photograph of an individual identified as S.E. and identifying S.E.'s business information as well. The CW immediately informed agents about the message received from RIVERA.

37. In response, law enforcement ran database queries based off the information provided by the CW regarding S.E. Though the queries, law enforcement identified S.E. and S.E.'s associated addresses.

38. Additionally, law enforcement conducted a Google search using the search phrase, "arthur aslanian vs. [S.E.]" The search return revealed a civil lawsuit from 2017 to 2019 involving "4402 MAMMOTH INVESTORS, LLC (Plaintiff) v.

STONEHAVEN, LLC," and S.E. personally.  A further computer
inquiry conducted by law enforcement revealed that S.E. has an
office located on Wilshire Boulevard in Los Angeles.

**F.    Interview of S.E. Concerning S.E.'s Business Dispute
        with ASLANIAN**

39.  On the afternoon of August 20, 2022, law enforcement
met with S.E.  Law enforcement informed S.E. that he was the
target of a murder-for-hire plot and asked if he was involved in
any litigation with 4402 Mammoth Investors, LLC.  S.E. responded
that he had been in litigation with the owner of 4402 Mammoth
Investors LLC, ASLANIAN, and that ASLANIAN had tried to take
possession of a house that had belonged to S.E.'s parents.  S.E.
said that S.E. parents' house was located in the Brentwood
neighborhood of Los Angeles, and that S.E. had accrued
approximately $800,000 in legal fees to get S.E.'s parents' home
back from ASLANIAN.[3]

40.  Agents showed S.E. a DMV photograph of ASLANIAN and
S.E. identified the person in the photograph as the same
individual who S.E. had sued in order to recover S.E.'s parents'
home.  S.E. added that he had met ASLANIAN a few times in court
and that ASLANIAN owned a couple of properties in the San
Fernando Valley.

---

[3] In a later interview with S.E., S.E. stated that when S.E.
won the lawsuit against ASLANIAN, ASLANIAN was required to pay
S.E.'s legal fees.  S.E. said that ASLANIAN had already paid
between $600,000 and $650,000 of the legal fees.

13

### G. Law Enforcement Conducts Surveillance on ASLANIAN and Observes Him at SUBJECT PREMISES 1

41. On the morning of August 23, 2022, law enforcement conducted physical surveillance in the vicinity of SUBJECT PREMISES 1.

42. Upon arrival at SUBJECT PREMISES 1, law enforcement observed the following vehicles parked in the driveway of SUBJECT PREMISES 1:

a. A white, four-door, BMW, bearing California license plate number 8JUW829;

b. A white, Ford F250, pickup truck, bearing California license plate number 05166K2 ("the Ford"); and

c. A white, two-door, BMW, convertible, bearing California license plate number 7XRV405.

43. At approximately 8:15 a.m., law enforcement observed a light silver, four-door, Volkswagen Passat bearing California license plate number 8MWW497, being driven by ASLANIAN, arrive at SUBJECT PREMISES 1 and park in the driveway.

44. At approximately 8:50 a.m., law enforcement observed ASLANIAN exit the front door of SUBJECT PREMISES 1, walk over to and enter the driver's seat of the Ford. Moments later, law enforcement observed an older unknown female exit the front door of SUBJECT PREMISES 1 and enter the front passenger seat of the Ford. Once both individuals were inside the Ford, law enforcement saw ASLANIAN drive away southbound on Alta Canyada Road from SUBJECT PREMISES 1.

14

45.   At approximately 10:35 a.m., law enforcement saw the
Ford arrive at an office building located at 1150 Foothill
Blvd., La Canada Flintridge, California.  The building had a
parking spot marked by a brown rectangular sign with white
lettering affixed to the building that read, "H" and "Arthur
Aslanian."[4]  ASLANIAN then got out of the Ford and walked towards
Suite H.

**H.   ATF UC and the CW Meet with RIVERA Regarding the Murder-for-Hire**

46.   On the afternoon of August 24, 2022, the UC, along
with the CW, met with RIVERA at SUBJECT PREMISES 2 regarding the
Murder-For-Hire.

47.   The UC was equipped with an audiovisual recording
device that would provide agents with a live audio feed and
record video and audio of the interaction.  ATF agents were also
positioned nearby to conduct surveillance of the meeting among
the UC, the CW, and RIVERA.

48.   At approximately 1:12 p.m., the CW exited the UC's
vehicle and contacted RIVERA at the front door.  The CW asked
RIVERA if it was okay for the UC to enter SUBJECT PREMISES 2 and
RIVERA agreed.

49.   Inside SUBJECT PREMISES 2, the CW informed RIVERA that
the UC was his "homie" who would help commit the murder-for-
hire.  RIVERA said he needed to speak with ASLANIAN because
ASLANIAN was looking for him the previous day.  RIVERA said

_____

[4] Around 10:05 a.m., law enforcement saw the same white BMW
bearing license plate 8JUW829 that had been parked at SUBJECT
PREMISES 1 drive up to and park in ASLANIAN's spot.  The car was
driven by a female who appeared to be ASLANIAN's daughter.

"it's going to happen" but told the CW that he needed to speak with ASLANIAN first.  The UC informed RIVERA that the UC traveled from Arizona and could get the job done and all the UC needed was confirmation from RIVERA that RIVERA and ASLANIAN wanted the murder committed.  The UC explained that he frequents Sonora[5] and hangs with Sicarios.[6]  The UC asked about how RIVERA and ASLANIAN wanted the murder committed.  The UC gave the examples of a burglary gone wrong, road rage incident, or just "cap the dude," as ways to commit the murder.  RIVERA stated ASLANIAN just wanted it done, "whatever happens, accident, whatever."  RIVERA explained that ASLANIAN did not want to know about it.  RIVERA said the less ASLANIAN knew the better.

50.  RIVERA asked if the UC needed a deposit up front to which the UC stated he needed $10,000, a firearm, and a rental vehicle.  RIVERA said ASLANIAN would only provide the money and not the firearm or rental vehicle.  RIVERA agreed to get additional money for the deposit which would include money for the firearm and rental vehicle, for a grand total of $22,000 once the murder was complete.  RIVERA told the UC that RIVERA is going to inform ASLANIAN what was needed and ASLANIAN would provide it to RIVERA.  RIVERA said once it was done, he would provide the other "thing," which the UC understood to mean the money for the murders.

---

[5] The UC is referring to Sonora, Mexico.

[6] The UC used the phrase "Sicarios," referring to hired assassins.

51.  The UC informed RIVERA that if they changed their mind or backed out the UC was "cool with that, no harm, no foul." RIVERA said he understood that it was "a go."  The UC asked RIVERA if he could call ASLANIAN or meet him to discuss the job. RIVERA reiterated that RIVERA was going to take care of it on behalf of ASLANIAN.  According to RIVERA, ASLANIAN did not want anything to do with it other than providing the money for the hitman.

52.  The UC asked RIVERA when the job needed to be completed.  RIVERA stated he would meet with ASLANIAN that day and get back to CW.  The UC told RIVERA to inform ASLANIAN if he wants it done, it would be done, if not, no problem.  RIVERA said if ASLANIAN says "no" he would ensure ASLANIAN gave the UC some money for his expenses.

53.  The UC informed RIVERA that he had seen a photograph of the victim and conducted surveillance on the victim.  The UC ensured RIVERA the job would get done right.  RIVERA informed the UC that ASLANIAN owned a construction company and that RIVERA was a superintendent for the company.  RIVERA told the UC that the problem was over a property and the victim had hired a good lawyer from New York.  According to RIVERA, ASLANIAN spent or lost over a million dollars in a lawsuit and lost his "shit" in Beverly Hills.

54.  RIVERA said ASLANIAN has done a lot for his family and to this day ASLANIAN has not backed out on his word.  RIVERA informed the UC that RIVERA was not making any money on the deal and at the end of the day RIVERA would prefer to give the UC

17

something, even if it was $50 or $100.  RIVERA offered CW and

the UC "pase," street vernacular referring to a line of cocaine,

but no cocaine was in plain view.  Both the CW and the UC

declined the cocaine and left SUBJECT PREMISES 2 shortly

thereafter.

55.  At the completion of the meeting, the UC and CW

departed the area of SUBJECT PREMISES 2 and drove back to the

remote staging location for a debrief.  While enroute to the

staging location, RIVERA called the CW.  RIVERA informed the CW

that he and ASLANIAN would be meeting at 5:00 p.m. that day to

discuss the situation.

**I.   Law Enforcement Conducts Surveillance of the Meeting between RIVERA and ASLANIAN**

56.  On August 24, 2022, following the meeting between the

UC, the CW, and RIVERA, law enforcement conducted surveillance

on RIVERA and ASLANIAN.

57.  At approximately 4:05 p.m., law enforcement observed

ASLANIAN enter the driver's seat of the Ford in the area of 914

N. Glendale Avenue and drive away northbound on Glendale Avenue.

A mobile surveillance was initiated on ASLANIAN.

58.  Meanwhile, at approximately 4:15 p.m., a separate law

enforcement surveillance team observed RIVERA driving an older

light blue Ford van, bearing California license plate number

4AXG053 (the "Van") northbound on Tujunga Avenue just south of

Morrison Street.  Additionally, law enforcement observed an

unknown thin built male Hispanic sitting in the front passenger

seat of the Van wearing a black and gray baseball hat and no

shirt.  At 4:35 p.m., law enforcement observed RIVERA eventually park to the rear of a building located at 4923 Lankershim Boulevard in North Hollywood, California.

59.  At approximately 4:55 p.m., law enforcement followed ASLANIAN to the vicinity of RIVERA's location at 4923 Lankershim Boulevard.  Law enforcement then saw ASLANIAN drive the Ford into the rear parking lot of 4923 Lankershim Boulevard and park the Ford, head in, in a parking spot across from RIVERA's Van. Once parked, ASLANIAN exited the Ford and RIVERA walked over to ASLANIAN and the two greeted each other.  The unknown male remained in the Van.  Law enforcement observed both ASLANIAN and RIVERA standing in close proximity to one another and engaged in what appeared to be a conversation for several minutes.

60.  At approximately 5:20 p.m., law enforcement saw ASLANIAN and RIVERA part ways.  ASLANIAN was observed entering the Ford and driving out of the area, while RIVERA was observed entering the Van and driving out of the area at which time the surveillance was ended.  Agents were able to take photographs and video of this meeting.

**J.   Conversation Between RIVERA and the CW, Following RIVERA's Meeting with ASLANIAN on August 24, 2022**

61.  On August 24, 2022, following the meeting between RIVERA and ASLANIAN, at approximately 6:09 p.m., RIVERA attempted to call the CW via Facebook Messenger.  Then, at approximately 6:20 p.m., RIVERA sent the CW a message via Facebook Messenger reading "Call me."

62.   At approximately 6:32 p.m., the CW called RIVERA using his Facebook Messenger application on the CW's cellular phone. RIVERA answered and said, "He wants to postpone it for two months and he wants to change the money, you know what I mean?" The CW replied, "No."  RIVERA explained to the CW that "he" did not want to use "his" money, instead "we are going to change it for other money."  RIVERA continued stating, " . . . it's going to be the money, but washed.  That's what he wants.  I'm telling you that's what he said.  Two more months, it's going to be ready.  Right now, he gave me $100 for you, for you know, for whatever."  RIVERA continued, "He doesn't want to give the money like that, doesn't want it to be coming out of his house, you understand?"

63.   RIVERA again told the CW that "he" needs two months to get the money.  The CW and RIVERA continued to discuss why ASLANIAN needed two months.  RIVERA told the CW that "he" is the one with the money so the CW cannot tell RIVERA how or when it is going to get done.  The CW then told RIVERA that RIVERA can hold onto the money until "it is done."[7]  RIVERA replied, "Yes, but before he gives me that money he wants it to be washed first."

64.   RIVERA told the CW that RIVERA "transferred" the message and "his" response was "two months."  RIVERA told the CW that the time is not up to RIVERA, it is how "he" wants it.  The CW replied to RIVERA that the CW understood.

---

[7] The CW is referring to the killing of intended victims.

65.   The CW indicated to RIVERA that the money can be washed in South Central to which RIVERA replied, "no."  RIVERA told the CW, "I got this, I'm going to take care of this." RIVERA stated that he knows somebody who owns a store.

66.   The CW told RIVERA that the CW knows people also that can help with the money.  RIVERA stated to the CW that "we" don't want to involve more people.  RIVERA told the CW that RIVERA does not know what else to say to the CW because that is what "he" wants.

67.   RIVERA told the CW, "Look, wait two months, I'm going to have him ten when he comes here to the house in two months." Based on my training, experience, and knowledge of the investigation, I believe that RIVERA was stating that RIVERA would have $10,000 for the CW's "cousin," the UC, when the UC returns in two months.

68.   RIVERA then asked the CW, "Do I give you the hundred and will you send it to him or what?"  The CW replied, "No, wait."

69.   RIVERA reiterated to the CW, "ten when he gets here." The CW replied, "I'll tell him when he comes."  Based on my training, experience, and knowledge of the investigation, I believe RIVERA was informing the CW that RIVERA would pay the UC $10,000, prepayment for the murders, when the UC comes back to carry out the murders in two months.

**K.    Detention and Interview of RIVERA on September 7, 2022**

70.   On September 7, 2022, the CW set up a meeting with RIVERA that was surveilled by law enforcement.  Upon arrival at

the meeting location, law enforcement detained and questioned
RIVERA concerning the murder-for-hire.

71.  At approximately 8:50 a.m. on September 7, 2022, ATF
agents Mirandized RIVERA and RIVERA agreed to speak with law
enforcement.  RIVERA told agents that in approximately March or
April of 2021, ASLANIAN had told RIVERA that there was an
individual who was, "fucking with him," and that the
individual's mother was living in one of ASLANIAN's properties
and didn't want to leave.  ASLANIAN had been in a legal battle
with the individual and ASLANIAN had told RIVERA that he was,
"tired of that motherfucker" and "wished something would happen
to that fucker."  ASLANIAN further stated that he wanted RIVERA
to "get rid of" this person.  ASLANIAN then asked, "Do you know
anybody?"  RIVERA understood ASLANIAN to be asking whether
RIVERA knew anyone who could kill the person who was giving
ASLANIAN trouble.  RIVERA initially told ASLANIAN that he
(RIVERA) didn't know anybody and didn't "do that stuff."

72.  About a year after this conversation with ASLANIAN, in
approximately April or May 2022, RIVERA told agents that the CW
had approached RIVERA and asked RIVERA if he knew of anyone who
needed someone to be "gotten rid of."  RIVERA responded that his
boss (referring to ASLANIAN) wanted to get rid of someone and
asked the CW if the CW could help.

73.  RIVERA told agents that, as of the time of his
discussion with law enforcement, there was only one individual
that RIVERA knew of who ASLANIAN wanted killed.  RIVERA said
that ASLANIAN did not give any details about how he wanted the

target killed as ASLANIAN didn't want any recordings of such conversation.  RIVERA also said that he would talk to ASLANIAN over the phone and, during the phone conversation, agree to meet ASLANIAN at a jobsite.  RIVERA and ASLANIAN would talk in more detail about the murder only when they met in person.  ASLANIAN would ask if RIVERA had looked into getting the murder done, at which point RIVERA would update ASLANIAN as to what the CW had said he would do to complete the murder.  RIVERA said that he wasn't going to get any kind of payment from ASLANIAN for the murder and so RIVERA never pressed ASLANIAN on moving forward with the murder.

74.  Law enforcement asked if RIVERA took ASLANIAN seriously when ASLANIAN initially approached RIVERA concerning the murder.  RIVERA said that he did take ASLANIAN seriously. RIVERA reiterated that when talking to ASLANIAN or the CW about "get(ting) rid of" someone, they were discussing having someone murdered.  RIVERA stated that ASLANIAN had provided RIVERA with the name of the person that ASLANIAN wanted murdered.  RIVERA was shown a picture of S.E. by law enforcement and RIVERA confirmed that the individual in the picture was the person that ASLANIAN wanted murdered.  RIVERA also stated that a photo that he was shown by law enforcement of M.Y. was an intended victim that ASLANIAN brought up to RIVERA later, but that the first intended victim was S.E.

75.  RIVERA stated that he showed the CW a photo of S.E. and told the CW that S.E. was the individual that ASLANIAN wanted killed.  The CW said that he would kill S.E. and asked

23

RIVERA how much ASLANIAN would be willing to pay.  RIVERA said that the CW provided RIVERA with a dollar amount for which the CW would be willing to commit the murder, at which point RIVERA told ASLANIAN how much the CW wanted to be paid.

76.  RIVERA explained that originally ASLANIAN had wanted RIVERA to hire the CW to kill S.E., however when ASLANIAN lost the lawsuit against S.E., that ALSANIAN then wanted to focus on the attorney, M.Y.  ASLANIAN told RIVERA that M.Y. had done a poor job representing ASLANIAN as ASLANIAN's attorney and that ASLANIAN owed money to M.Y.  RIVERA said that ASLANIAN also wanted M.Y. taken care of, however, RIVERA stated that he (RIVERA) understood that to mean that ASLANIAN wanted M.Y. intimidated, not killed.  RIVERA said ASLANIAN wanted M.Y. intimidated so that ASLANIAN would not have to pay M.Y. money that ASLANIAN owed.  RIVERA said that the CW had called RIVERA while the CW was in Santa Clarita, and that the CW had asked if ASLANIAN wanted the job done, but that RIVERA had told the CW not to do the job because RIVERA understood that ASLANIAN only wanted M.Y. intimidated.  RIVERA reiterated that M.Y. had represented ASLANIAN, but that ASLANIAN felt that M.Y. had done a "shitty" job and ASLANIAN did not want to pay M.Y. for his services.  RIVERA said that ASLANIAN had identified M.Y. to RIVERA by showing RIVERA a picture from M.Y.'s company website. RIVERA said that ASLANIAN showed RIVERA the picture of M.Y. on ASLANIAN's phone.

77.  RIVERA said that he had originally talked to the CW about having S.E. murdered in approximately March 2022.  RIVERA

also said that he couldn't remember if S.E. was a lawyer or a
CEO of a company.  RIVERA said that at that time the CW said
that he wanted to be paid $20,000 to kill S.E., but then later
the CW came to RIVERA and said that neither the CW or RIVERA
should move forward with the murder, and that instead they
should have a third party commit the murder.  RIVERA said that
the CW brought over a third party who RIVERA had never met
before.

78.  RIVERA said that sometime between July 2022 and August
2022, RIVERA had asked ASLANIAN what he wanted done with M.Y.,
at which point ASLANIAN told RIVERA that ASLANIAN instead wanted
to focus on S.E. because he was a "prick."  RIVERA indicated
that ASLANIAN wanted S.E. killed because ASLANIAN thought that
S.E. was a "piece of shit" and a "no good motherfucker" who
"probably deserves it."  RIVERA understood ASLANIAN to mean that
he wanted S.E. murdered.

79.  RIVERA also told agents that ASLANIAN had identified
S.E. to RIVERA by showing him the business website of S.E.
RIVERA stated that he could not remember the name of the
business but did remember that the website showed the business
on Wilshire Boulevard and that S.E was the CEO of the company.
RIVERA stated that he had a screenshot of S.E.'s Facebook
profile picture which RIVERA had shared with the CW in order to
identify S.E.

80.  RIVERA conveyed that in his conversations with
ASLANIAN, ASLANIAN wanted S.E. murdered, however ASLANIAN made

it clear that he did not want to know any details and that the
less he knew about the murder the better.

81.  RIVERA said that on August 24, 2022, RIVERA met with
the CW and a man he did not know (referring to the UC) that the
CW brought with him.  RIVERA discussed the price to have S.E.
murdered with the UC and told the UC that RIVERA thought that
ASLANIAN wanted to move forward with the murder but that RIVERA
would have to confirm with ASLANIAN.  RIVERA then stated that he
became reluctant about moving forward with the murders because
he was uncomfortable with the UC.  RIVERA said that the UC said
that it wasn't a problem if ASLANIAN and RIVERA didn't want to
move forward with the murder, however it was RIVERA's
understanding that ASLANIAN did want to move forward with the
murders and that RIVERA would meet with ASLANIAN later to
confirm that.  RIVERA again said he was going to meet with
ASLANIAN in person because RIVERA and ASLANIAN did not want to
talk over the phone about the murder.  RIVERA said that he was
loyal to ASLANIAN because ASLANIAN was RIVERA's boss and that
ASLANIAN provided for RIVERA.

82.  RIVERA said that on the evening of August 24th, he
called ASLANIAN and asked ASLANIAN to meet him at Skinny's
Lounge because RIVERA had some tools there from a concrete
polishing job he had done.  RIVERA said that during the meeting
with ASLANIAN, RIVERA told ASLANIAN about the UC that the CW had
brought, and RIVERA thought that the UC was "sketchy."  RIVERA
said that because the UC was "sketchy" they did not want to move
forward with the murder at that time and instead were going to

26

tell the CW that they wanted to wait 2 months to have the murder done.  RIVERA said that ASLANIAN paid RIVERA $100.00 to give the UC as gas money for the UC's trouble.  RIVERA said that he understood ASLANIAN to be uncomfortable moving forward with the UC doing the murder because RIVERA and ASLANIAN didn't trust the UC to complete the murder.  RIVERA said that the UC had given the option to not move forward with the murder, so they didn't feel pressured to move forward with it.  RIVERA then clarified that when he first met with ASLANIAN on August 24th, ASLANIAN wanted to move forward with the murder and that he (ASLANIAN) wanted to "clean" the money so that it didn't come back to him. RIVERA stated, however, that he was uncomfortable with the UC, and that ASLANIAN wanted RIVERA to tell the CW and the UC that they were going to wait 2 months to "clean the money" in hopes that the UC would no longer be involved in the murder and the CW would move forward with the murder alone.

**L.   Meeting between RIVERA and ASLANIAN on September 8, 2022**

83.  On September 7, 2022, at the direction of law enforcement, RIVERA placed a phone call to ASLANIAN in order to set up a meeting with ASLANIAN and determine if he still wanted to move forward with the murder of S.E.  During the conversation, RIVERA asked if ASLANIAN was available to meet. ASLANIAN advised RIVERA that he was busy and could not meet that day (September 7, 2022).  RIVERA and ASLANIAN then agreed to meet the next day (September 8, 2022) at 11:00 a.m. at the

Denny's restaurant located at 11377 Burbank Boulevard in the City of North Hollywood, California.

84.  On September 8, 2022, law enforcement outfitted RIVERA with audiovisual recording equipment in order to capture the meeting between him and ASLANIAN regarding the murder-for-hire plot.

85.  At approximately 11:05 a.m., RIVERA received a phone call from ASLANIAN.  ASLANIAN stated to RIVERA that he (ASLANIAN) would meet RIVERA at the Sunrise Ford dealership located at 5500 Lankershim Boulevard, North Hollywood, California.

86.  At approximately 11:15 a.m., RIVERA met with ALSANIAN in the front of the dealership.  The two greeted one another. ASLANIAN then invited RIVERA to "walk and talk" to which RIVERA agreed.  The two then proceeded to walk southbound on Lankershim Boulevard from the dealership.

87.  ASLANIAN began the conversation by asking RIVERA, "So, what's going on?"  RIVERA replied that he (RIVERA) talked to the CW and that the CW was "going to handle" the murder by himself.

88.  ASLANIAN then asked RIVERA if he (RIVERA) gave any money to "him" (referring to the CW) for "an exit."  RIVERA understood ASLANIAN to be asking whether RIVERA had given money to exclude the UC from further involvement in the murder. RIVERA replied, "Yeah."  RIVERA stated to ASLANIAN that the CW did not need any additional money up front and only asked for $200 dollars for a "rental car."  ASLANIAN responded and expressed concern about the "rental car."  ASLANIAN then told

28

RIVERA that a renting a car is "dangerous." ASLANIAN continued
by asking RIVERA, "this is the deal, this is for Santa Clarita?"
(Note: Santa Clarita is referring to the second potential murder
victim from the Santa Clarita area, attorney M.Y.). RIVERA
replied, "No, west side." (Note: "West side" is referring to
S.E). ASLANIAN replied, "Oh, west side. Okay. How are we going
to clean the bills?" RIVERA told ASLANIAN that he (RIVERA) has
trust in the CW. ASLANIAN asked if the CW is going to pressure
him (ASLANIAN) in getting "cash right away." RIVERA replied
that according to the CW there will be no pressure and it will
be "one and done, then just give the money." ASLANIAN told
RIVERA that the cash he (ASLANIAN) has is only "rent money" from
people that live in his (ASLANIAN's) buildings. ASLANIAN
further stated that it would not be a good idea to give the CW
any of the rent money because his (ASLANIAN'S) fingerprints may
be on them. ASLANIAN asked RIVERA if taking the money to a
"check cashing" location to exchange the bills would be a good
idea, to which RIVERA agreed.

     89.  RIVERA again told ASLANIAN that the CW just wanted
money to get a rental car. ASLANIAN advised RIVERA that the CW
should not rent a car. ASLANIAN then asked RIVERA if the CW was
going to steal a car instead, or "how does he do it?" RIVERA
replied, "He's wants to rent it." ASLANIAN told RIVERA, "That's
crazy! They'll know who it is." ASLANIAN explained to RIVERA
why renting a car is a bad idea by citing an incident of an
arson that occurred in downtown Los Angeles. ASLANIAN stated to
RIVERA that he (ASLANIAN) was told of a story from a friend and

added that it was "high level shit."  According to ASLANIAN, an arson occurred in a "big building" right off the 110 freeway. ASLANIAN added that the building was owned by "Geoff Palmer" and the arson caused about $200 million in damages.  ASLANIAN stated that the man who committed the arson was caught.  ASLANIAN further stated, "Just so you know, to the extent of how these people can operate" (referring to law enforcement and arson investigators).  ASLANIAN explained to RIVERA that "they" looked into "all the camera systems" including police vehicle in-car cameras and found a vehicle that resembled a "cab" taxi. ASLANIAN continued by stating "they" investigated further into the "cab" taxi by running all the cab companies and taxi auctions until they found a suspect in the arson.  ASLANIAN stated "they" also investigated into cell phone pings by looking at cell phone towers in the area of the arson. ASLANIAN concluded the story by advising RIVERA that the CW cannot have a phone or rent a car if he (the CW) was "going to do anything." ASLANIAN told RIVERA, "They'll find his ass, they'll find him" (referring to the CW being caught by law enforcement for committing the murder).

90.  ASLANIAN then asked RIVERA if "he" (the CW) knows "me" (ASLANIAN).  RIVERA replied, "No."  RIVERA told ASLANIAN that all the CW needs is some money.  ASLANIAN replied, "How are we going to know it's done? Obviously, I don't want a picture." ASLANIAN continued, "We'll know it's done because they'll probably call me" to which RIVERA replied, "Yeah."  ASLANIAN then asked RIVERA, "You're not going to stay connected right?

30

How are you going to stay clear?  By not talking, not texting?"
RIVERA replied, "Yeah, none of that.  All in person."  ASLANIAN
asked RIVERA, "phones are going to be around?  When he goes to
do that, he should not have his phone" (referring to the CW not
having his phone when committing the murder).

91.  ASLANIAN explained to RIVERA, referencing the arson
story again, "Just so you know, when this fire happened, they
asked me for my permission to go into cell tower records, to see
where I was.  So, make sure [the CW] and yourself have an
alibi."  ASLANIAN concluded by stating, "After today, we don't
talk about it ever again."

92.  ASLANIAN then changed the conversation and talked with
RIVERA during the remainder of the meeting about ASLANIAN's
rental business and other unrelated matters.

**M.   Database Queries Concerning SUBJECT PREMISES 1**

93.  A computer inquiry by law enforcement for registered
firearms possessed by ASLANIAN through the California Department
of Justice database revealed that ASLANIAN currently has
approximately six firearms registered to him.  Moreover, the
inquiry revealed, during his most recent firearm registration on
July 18, 2020, ASLANIAN cited SUBJECT PREMISES 1 as his
residential address.

94.  The DMV record for the 2019, silver, four-door
Volkswagen Passat, bearing California license plate number
8MWW497, observed by law enforcement at SUBJECT PREMISES 1
during a surveillance operation conducted on August 23, 2022,
revealed the vehicle was registered to "Anita Aslanian Hartoyan"

at the address of SUBJECT PREMISES 1.  Law enforcement observed
ASLANIAN driving this vehicle at SUBJECT PREMISES 1 during
surveillance on August 23, 2022.

### N.    Database Queries Concerning SUBJECT PREMISES 2

95.   A public internet search for RIVERA's name and the
address of SUBJECT PREMISES 2 revealed a record for a business,
NSB Concrete, that City of Los Angeles Business records identify
as being associated with RIVERA and SUBJECT PREMISES 2.  Another
website for NSB Concrete Polishing listed an address of SUBJECT
PREMISES 2 and listed Rivera Cell as the contact number for the
business.

### V.   <u>TRAINING AND EXPERIENCE ON MURDER-FOR-HIRE OFFENSES</u>

96.   Based on my training and experience, and the training
and experience of other agents with greater prior involvement in
murder-for-hire investigations, I know the following:

a.    Individuals who seek the assistance of others to
murder someone often maintain materials about their intended
victims in their residences, in their vehicles, on their
persons, and on their digital devices.  Murder-for-hire suspects
often maintain information about their intended victims in order
to provide it to their chosen "hitman" to ensure that the
"hitman" kills the correct target.  This information could
include photographs of the intended victims, their home address,
their business address, information about other places they
frequent or their habits generally, information about the
victims' family members, and other information that could be

used by a hitman to carry out the murder for which he or she is hired.

b.    Individuals who seek out the assistance of others to murder someone often do so because the individual believes that the intended victim has wronged him/her or poses some threat or risk to the individual's business, personal, or other interests.  Murder-for-hire suspects often maintain information about their intended victims and the origins of the perceived or actual dispute with, or threat or risk posed by, the victims.  Suspects often maintain this information in their residences, vehicles, on their persons, and on their digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

97.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

98.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

99.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

35

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ASLANIAN's or RIVERA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ASLANIAN's or RIVERA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII. <u>CONCLUSION</u>

100. For all the reasons described above, there is probable cause to believe that ASLANIAN and RIVERA committed a violation of 18 U.S.C. § 1958 (Conspiracy to Murder-For-Hire). Further, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found in a search of SUBJECT PREMISES 1, SUBJECT PREMISES 2, the person of ASLANIAN, and the person of RIVERA as further described above and in Attachments A-1, A-2, A-3, and A-4 to this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>14th</u>day of
September, 2022.

_____
UNITED STATES MAGISTRATE JUDGE